# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

CARRIE ANN BELL,                    :

           Plaintiff        :        No. 3:15-CV-0[117]

vs.                          :        (Judge Nealon)

                      :

CAROLYN W. COLVIN, Acting       :
Commissioner of Social Security,  :

           Defendant        :

**FILED**
**SCRANTON**

JUL 2 0 2016

PER _____ _____
DEPUTY CLERK

## MEMORANDUM

On January 19, 2015, Plaintiff, Carrie Ann Bell, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2] under

Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. §

1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For

the reasons set forth below, the decision of the Commissioner denying Plaintiff's

applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on September 21, 2010, alleging disability beginning on December 31, 2005 due to back problems, headaches, and a mental handicap. (Tr. 20, 32-46, 248).[4]  These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on April 9, 2012.  (Tr. 20).  On April 18, 2012, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 20).  An oral hearing was held on May 15, 2013, before administrative law judge Randy Riley, ("ALJ"), at which Plaintiff and an impartial vocational expert, Brian Bierley, ("VE"), testified.  (Tr. 20).  On May 24, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing light work with limitations.  (Tr. 24).

On June 28, 2013, Plaintiff filed a request for review with the Appeals

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 10, 2015.  (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Council. (Tr. 14-16). On July 17, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 19, 2015. (Doc. 1). On March 31, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 12 and 13). Plaintiff filed a brief in support of her complaint on May 15, 2015. (Doc. 14). Defendant filed a brief in opposition on June 16, 2015. (Doc. 17). Plaintiff filed a reply brief on November 4, 2015. (Doc. 19).

Plaintiff was born in the United States on February 15, 1982, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 205). Plaintiff graduated from high school in 2001, and can communicate in English. (Tr. 247, 249). Her employment records indicate that she previously worked as a sales assistant and housekeeper. (Tr. 221). The records of the SSA reveal that Plaintiff had earnings in the years 1999 through 2009. (Tr. 169). Her annual earnings range from a low of fourteen dollars and sixty-three cents ($14.63) in

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

3

2009 to a high of seventeen thousand five hundred eight dollars and eight cents ($17,508.08) in 2005. (Tr. 169). Her total earnings during these ten years were seventy thousand three hundred three dollars and ninety-two cents ($70, 303.92). (Tr. 169).

In a document entitled "Function Report - Adult" filed with the SSA on _____ Plaintiff indicated that she lived in a mobile home with her family. (Tr. 229). From the time she woke up to the time she went to bed, Plaintiff got her children ready for school and "tried to clean up the place." (Tr. 230). She took care of her two (2) children with the help of her mom. (Tr. 230). She had no problems with personal care tasks, indicated that she "cooked for [her] kids and [herself] even though [she couldn't] stand that long," could do the laundry thought it "would take [her] forever," tried to clean every day, and shopped for clothes and/ or food once a month because "it [took] [her] forever." (Tr. 230-232). She needed encouragement and help from her mom and friend to perform these activities. (Tr. 231). She was able to drive a car without being accompanied. (Tr. 232). She was able to walk for "2 aisle[s] in the store," and once she stopped to rest she would be "done." (Tr. 234). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, concentration, understanding, following instructions, using

hands, or getting along with others. (Tr. 234).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, take her medicine, or attend her appointments. (Tr. 231, 233). She could pay bills, handle a savings account, and use a checkbook, but could not count change because she did not have any to count. (Tr. 232). She could not pay attention for long, followed written and spoken instructions "ok," she was not able to finish what she started, and she did not hand stress or changes in routine well. (Tr. 234-235).

Socially, Plaintiff went out when her kids wanted to, but she did not have any hobbies or interests and did not go anywhere on a regular basis. (Tr. 231-233). She did spend time with her family when they visited her. (Tr. 233). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 234).

At her oral hearing on May 15, 2013, Plaintiff testified that she was disabled due to a combination of back pain, headaches, and a mental handicap. (Tr. 36-48). She responded that she was able to walk less than a mile, stand for fifteen minutes before needing to sit, and sit for a half hour before needing to move, all due to back pain and spasms. (Tr. 41-42). Her back pain was constant, and nothing helped to relieve her pain. (Tr. 46). She was on medication for her headaches,

which decreased the frequency of headaches to every two days or so.  (Tr. 45).

## MEDICAL RECORDS

On March 24, 2010, Plaintiff was evaluated by Bruce Goodman, M.D.  (Tr. 288).  It was noted that Plaintiff had low back pain localized to the lumbar area and "manifested by exacerbations and complete remissions.'  (Tr. 288).  She did not experience extremity radiculitis, paresthesias, or augmentation of the pain, and never had treatment directed to her lower back pain.  (Tr. 288).  It was noted that Plaintiff was capable of cooking, cleaning, grocery shopping, driving, and child care.  (Tr. 289).  Her exam revealed that she walked with a reciprocal heel-toe gait pattern with ease, normal lordosis in the absence of paravertebral muscle spasm, normal rotations both internally and externally, present and equal bilateral patella and Achilles reflexes, an intact sensory system, negative straight leg raising tests, and no muscle fasciculation, atrophy or weakness.  (Tr. 289).  Plaintiff underwent x-rays of her lumbar spine.  (Tr. 290).  These revealed minimal left lumbar scoliosis, but otherwise normal findings.  (Tr. 290).  Dr. Goodman opined Plaintiff could: (1) could frequently lift up to twenty (20) pounds and occasionally lift up to forty (40) pounds; (2) could frequently carry up to twenty-five (25) pounds; (3) had no limitations with sitting, standing, or walking; (4) could occasionally bend, kneel, stoop, crouch, and climb; and (5) could never balance.  (Tr. 291-292).

6

On March 31, 2010, Plaintiff's records were evaluated by Joseph Agliotta, M.A., a consulting psychologist, due to an intellectual evaluation request from the BDD. (Tr. 293). It was noted that Plaintiff attended special education throughout elementary and high school, that her verbal IQ was a sixty-six (66), that her performance IQ was a sixty-four (64), and that her full scale IQ was a sixty-three (63). (Tr. 294). Dr. Agliotta noted that "her intellectual improvement based on her history, education, and current test scores is poor." (Tr. 295). He diagnosed Plaintiff with mild mental retardation, and noted that she would need assistance and oversight in managing any financial benefits. (Tr. 295). Dr. Agliotta opined Plaintiff: (1) had slight restrictions in her ability to understand and remember and carry out short, simple instructions; (2) moderate restrictions in her ability to understand, remember, and carry out detailed instructions; (3) moderate restriction in her ability to make judgments on simple work-related decisions; (4) slight restrictions in her ability to interact appropriately with the public, supervisors, and co-workers; and (5) moderate restrictions in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. (Tr. 297). Dr. Agliotta also opined that Plaintiff would need support and supervision with her intellectual activities of daily living and custodial care for financial responsibilities. (Tr. 298).

On April 22, 2010, Michael Suminski, Ph.D. performed a Mental Residual

Functional Capacity analysis of Plaintiff. (Tr. 299-302). Dr. Suminski opined that

Plaintiff was not significantly limited in her ability to remember locations and

work-like prodecures; to understand, remember, and carry out very short and

simple instructions; to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; to sustain an ordinary

routine without special supervision; to work in coordination with or proximity to

others without being distracted by them; to make simple work-related decisions; to

complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; to interact appropriately with the

general public; to ask simple questions or request assistance; to accept instructions

and respond appropriately to criticism from supervisors; to get along with

coworkers or peers without distracting them or exhibiting behavioral extremes; to

maintain socially appropriate behavior and to adhere to basic standards of neatness

and cleanliness; to respond appropriately to changes in the work setting; to be

aware of normal hazards and take appropriate precautions; to travel in unfamiliar

places or use public transportation; and to set realistic goals or make plans

independently of others. (Tr. 299-300). Dr. Suminski also opined that Plaintiff

was moderately limited in her ability to understand, remember, and carry out detailed instructions and to maintain attention and concentration for extended periods. (Tr. 299). Dr. Suminski noted that evidence established a medically determinable impairment of Mild Mental Retardation, but that she was "quite high functioning" despite this impairment because she was able to cook, clean, shop, count change, and drive. (Tr. 301). Dr. Suminski adopted the findings and opinions of Dr. Agliotta. (Tr. 301). He concluded that Plaintiff was able to meet the basic mental demands of simple routine work on a sustained basis despite the limitations resulting from her impairment. (Tr. 301). Dr. Suminski also performed a Psychiatric Review Technique for Listing 12.05, Mental Retardation. (Tr. 303). Dr. Suminski opined that Plaintiff had no restrictions in activities of daily living, had mild limitations in difficulties with maintaining social functioning, had moderate limitations in difficulties in maintaining concentration, persistence, or pace, and had no repeated episodes of decompensation. (Tr. 313).

On April 20, 2011, Plaintiff had an appointment with Dr. Albright for lower back pain that was intermittent, radiated to her right thigh, and was aggravated by stair ascension, extension, and standing. (Tr. 366). Plaintiff's exam revealed she was alert and oriented; had a positive straight leg raising test on the right side; and had no scoliosis or kyphosis. (Tr. 367). Plaintiff was instructed to start physical

therapy, and was scheduled for a follow-up visit in two (2) weeks.  (Tr. 368).

On May 4, 2011, Plaintiff had an appointment with Dr. Albright for lower pain back that radiated into the right thigh, with symptoms relieved by exercise and Plaintiff reporting that she had been doing somewhat better and would continue with physical therapy.  (Tr. 364).  Her exam revealed tenderness in the right sacroiliac area.  (Tr. 365).  She was scheduled for a follow-up in two (2) weeks.  (Tr. 365).

On August 15, 2011, Plaintiff had an appointment with Dr. Albright for pain in her right side and lower back after she did not respond to an injection into her right sacroiliac area.  (Tr. 361).  Plaintiff's exam revealed she had tenderness in her right sacroiliac area, and that she was able to walk on her toes and heels, bend forward to sixty (60 degrees, and bend laterally to ten (10) degrees.  (Tr. 362).

On September 21, 2011, Plaintiff had an appointment with Malgorzata Sidor, M.D. at Hershey Medical Center due to complaints of lower back pain radiating into her right leg.  (Tr. 332-334).  Plaintiff reported that: her pain was a seven (7) out of ten (10) on average; her back pain was constant and sharp while active, but dull while not active; her right leg pain was sharp, intermittent, and related to activity; heating pads and physical therapy exercises helped; she had some degree of depression and suicidal ideation in the past; and she was incapable

of bending or lifting objects for an extended amount of time. (Tr. 333). Plaintiff's examination revealed she: was in no distress; had a normal gait and was able to tiptoe and heel walk; had normal neck flexion, extension, and lateral movement; had full strength in her lower extremities; had normal reflexes; had a positive right-sided straight leg raising test; and had some tenderness to palpation at L5-S1. (Tr. 333). Dr. Sidor's impression was that Plaintiff had pain originating in her sciatic nerve on her right side. (Tr. 333). He ordered an MRI of her spine, and was scheduled for an epidural injection. (Tr. 333).

On October 11, 2011, Plaintiff had an appointment with Yakov Vorobeychik, M.D. to be assessed for "behavioral medicine needs regarding her efforts to manage her long-standing chronic pain problems." (Tr. 317). It was noted that she was timid but cooperative, had a decent mood if people did not make her mad, had a poor appetite, had little social contact, disliked crowds, had poor sleep quality, experienced significant mood swings, and was dysphoric with low energy levels. (Tr. 319). She was diagnosed with "pain disorder associated with psychological factors" and "bipolar disorder I, most recent episode depressed, severe, without psychotic features." (Tr. 320). Her Global Assessment of Functioning score was a forty-two (42). (Tr. 320).

On November 7, 2011, Plaintiff was seen by Virginia Thompson, CRNP at

11

Hershey Medical Center. (Tr. 329-331). Plaintiff's exam revealed that Plaintiff:

was pleasant; had full range of motion in her neck without pain; had full strength

in her upper and lower extremities with no gross

sensory deficits; had some guarding with range of motion in her lower back, but

no focal tenderness to palpation in her low back; and had a positive right-sided

straight leg raise test. (Tr. 330). Plaintiff noted that the Neurontin had not been

helping and that she continued to experience back and right leg pain. (Tr. 329).

Plaintiff was scheduled for an MRI of her lumbar spine, and was instructed to

increase her Neurontin dose. (Tr. 330).

On November 11, 2011, Plaintiff underwent an MRI of her lumbar spine.

(Tr. 327). The findings from this MRI revealed a normal anatomic lumbar spine,

with no central, lateral recess, or foraminal stenosis or degenerative changes at any

of the lumbar levels. (Tr. 327-328). Plaintiff did have a "mild posterior central

disc protrusion at L5-S1." (Tr. 328).

On December 15, 2011, Plaintiff underwent an examination by Virginia

Thompson, CRNP at Hershey Medical Center's Pain Management Clinic. (Tr.

325). Her exam revealed the following: full range of motion in her neck; full

strength without sensory deficits in her lower extremities; guarded range of motion

in her back; tenderness to palpation at the L3-L4 disc level; and positive straight

12

leg raising tests. (Tr. 326). Plaintiff described her pain in her lower back and right leg as constant, dull, and aching. (Tr. 325). Because her exam did not explain her pain, Plaintiff was scheduled for an EMG of her right lower extremity. (Tr. 326).

On December 19, 2011, Plaintiff had an appointment with Dr. Albright for pain management of her back pain. (Tr. 358). Plaintiff described her lower back pain as burning, deep, and sharp. (Tr. 358). Her pain was aggravated by bending, lifting, standing, and walking. (Tr. 358). Plaintiff was in moderate distress, had lumbar tenderness, had an intact memory, and had an appropriate mood and affect. (Tr. 359). Plaintiff was prescribed Hydrocodone and Tramadol for pain. (Tr. 360).

On January 30, 2012, Plaintiff underwent an EMG study for her lower right extremity pain. (Tr. 511). The study's interpretation noted that the study was normal with no electrodiagnostic evidence of a lumbosacral, plexopathy, or generalized polyneuropathy affecting the lower right extremity. (Tr. 513).

On February 6, 2012, Plaintiff had an appointment with Dr. Albright for back pain and to have Family Medical Leave Act forms completed. (Tr. 435). It was noted that her lower back pain was radiating to the right thigh and calf, was stabbing, was aggravated by sitting, sneezing, twisting, and walking, and was not

relieved. (Tr. 435). Her exam revealed lumbar spine tenderness and a positive straight leg raising test on her right leg. (Tr. 436).

On February 27, 2012, Plaintiff had an appointment with Virginia Thompson, CRNP at Hershey Medical Center's Pain Management Clinic for lower back pain. (Tr. 506). It was noted that a prior prescription of Neurontin did not improve Plaintiff's pain, so the dosage was increased. (Tr. 506). Plaintiff noted that her pain was worse with walking, cleaning, and sitting down, and that it radiated intermittently to her right leg no further than her calf. (Tr. 506). She described her pain as constant, sharp, and aching, and rated it at an eight (8) out of ten (10). (Tr. 506). Her medications included only Gabapentin. (Tr. 506). Her exam revealed the following: she had full range of motion in her neck without pain; had 5/5 strength bilaterally in her upper and lower extremities without any gross sensory deficits; had some guarding with range of motion in her lower back; had some facet tenderness over the lower facets on the right; and had a positive straight leg raising test on the right for pain traveling posteriorly no further than the calf. (Tr. 507). She was assessed for lumbar radiculopathy and lumbar spondylosis. (Tr. 507). An MRI of her pelvis was ordered to rule out a sacral cyst that could produce a nerve root compression. (Tr. 507). Plaintiff was scheduled for a follow-up in one (1) month. (Tr. 507).

On March 26, 2012, Plaintiff had an appointment with Virginia Thompson, CRNP for a follow-up of her lower back pain. (Tr. 497). Her diagnostic testing results were reviewed, which showed a mild posterior disc protrusion at L5-S1 and a normal EMG. (Tr. 497). Plaintiff rated her pain at a six (6) out of ten (10) at its best and an eight (8) out of ten (10) at its worst, and noted that her pain was constant and aching. (Tr. 497). Plaintiff's physical exam revealed that: she had full range of motion in her neck without pain; had 5/5 strength bilaterally in her upper and lower extremities without any gross sensory deficits; had some guarding with range of motion in her lower back; had some facet tenderness over the lower facets on the right; and had a positive straight leg raising test on the right for pain traveling posteriorly no further than the calf. (Tr. 498). She was assessed as having lower back pain and lumbar spondylosis. (Tr. 498). Plaintiff was instructed to take Naproxen, to follow up with her primary care physician, and to return for a follow-up in two (2) months. (Tr. 498).

On March 26, 2012, Roger Fretz, Ph.D, completed a mental Residual Functional Capacity form and Psychiatric Review Technique form. (Tr. 55-64). He opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 59).

15

Dr. Fretz found that Plaintiff had no understanding or memory limitations; no social interaction limitations; was not significantly limited in her ability to carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, make simple work-related decisions, perform at a consistent pace; but that she was moderately limited in her ability to carry out detailed instructions, maintain concentration and attention for extended periods, and respond to change in the work setting. (Tr. 62-63). Dr. Fretz explained that Plaintiff had not been treated for any mental impairment, and that her "overall functional profile" was inconsistent with a low IQ score since she had been employed, could care for herself and her children, perform activities of daily, and had no social limitations. (Tr. 63).

On April 2, 2012, Plaintiff had an appointment with Dr. Albright for back pain and radiculopathy. (Tr. 433). Her exam revealed Plaintiff was: positive for back pain with lumbar spine tenderness and a moderately reduced range of motion; a radiculopathy in the right leg; and a normal gait. (Tr. 434). She was diagnosed with sacroilitis, shoulder pain, and radiculopathy. (Tr. 434). Her active medications included Cymbalta and Ventolin. (Tr. 434).

On April 4, 2012, Candelaria Legaspi, M.D., completed a physical Residual Functional Capacity assessment indicating that Plaintiff: could occasionally lift

twenty (20) pounds; could frequently lift ten (10) pounds; could stand and/or walk

for six (6) hours in an eight (8) hour workday; could sit for six (6) hours in an

eight (8) hour workday; could occasionally climb ramps, stairs, ladders, ropes,

scaffolds, and balance; had no limitations on stopping, kneeling, crouching, or

crawling; had no manipulative, visual, or communicative limitations; and had to

avoid moderate exposure to wetness, humidity, fumes, odors, dusts, gases,

and poor ventilation. (Tr. 62).

On May 25, 2012, Plaintiff had an appointment with Linda Ulrich, CRNP

for headaches with an onset of three (3) weeks. (Tr. 429). Her headaches were

moderate, constant, affected the right temporal, were associated with stress, were

aggravated by bright lights and noise, and included symptoms of dizziness,

phonophobia, and photophobia. (Tr. 429). Her exam revealed she was positive

for back pain; had a grossly normal intellect; had no sensory or motor loss or

weakness; had intact gait, coordination, and reflexes; and had normal judgment,

mood, and affect. (Tr. 430-431). Her active medications at the end of this visit

included Sumatriptan, Neurontin, and Ventolin. (Tr. 431). She was instructed to

avoid bright lights and loud noises. (Tr. 431).

On June 29, 2012, Plaintiff had an appointment with Linda Ulrich, CRNP

due to complaints of: migraines that were moderate, pattern less, aggravated by

bright lights and noise, relieved by prescription medicine, and associated with

dizziness, phonophobia, and photophobia; and lower back pain that was persistent,

sharp, worsening, radiating into her right calf, aggravated by bending, lying,

rolling over, sitting, and standing, and relieved by pain medicine. (Tr. 425).

Plaintiff reported that she was able to sleep on the affected side, squat, kneel, stand

from a seated position, style her hair, walk household distances, and shower, but

that she found it difficult to drive, get in and out of a vehicle, and walk community

distances. (Tr. 425). Her exam revealed: spasms; normal gait; tenderness in her

cervical and lumbar spine; moderate pain with motion in her lumbar spine; active

painful range of motion with no limiting factors in her lumbar spine; no

restrictions in flexion, extension or lateral bending; no pain in her hips, ankles, or

feet upon range of motion both actively and passively; normal bilateral lower

extremity strength and neurovascular findings. (Tr. 425-427). Plaintiff was

instructed to continue her medications, and was scheduled for a follow-up visit for

four (4) weeks. (Tr. 428).

On July 27, 2012, Linda Ulrich, CRNP, completed a Residual Functional

Capacity Questionnaire. (Tr. 388). Plaintiff's diagnoses included low back pain

with radiation to the right leg, Fibromyalgia, and migraines, with a good

prognosis. (Tr. 388). Nurse Ulrich indicated that Plaintiff's impairments were

18

only "seldom" severe enough to interfere with the attention and concentration required to perform simple work related tasks; that she could only walk a half block; that she could sit for thirty (30) minutes at a time; that she could stand and walk for fifteen (15) minutes at a time; that she could sit for three (3) hours in a day; that she could stand and walk for three (3) hours in a day; that she would need a job that permitted shifting positions; and that she would need to take an unscheduled twenty (20) to thirty (30) minute breaks every two (2) hours. (Tr. 388). Nurse Ulrich also opined that Plaintiff could frequently lift less than ten (10) pounds; occasionally lift up to twenty (20) pounds; had no limitation in the use of her hands and fingers, but could only use her right arm sixty percent (60%) of the time; and that she was not capable of performing full time work. (Tr. 388).

On September 5, 2012, Plaintiff had an appointment with Virginia Thompson, CRNP for a follow-up visit. (Tr. 486). It was noted that multiple medications that had been prescribed and tried by Plaintiff, including Naproxen and Tramadol, did not help. (Tr. 486). Her pain in her lower back was rated at a ten (10) out of ten (10) and was described as constant. (Tr. 486). Her physical exam revealed that she: demonstrated a full range of motion in her neck without pain; had 5/5 upper and lower bilateral extremity strength with no gross sensory deficits; had guarded range of motion in her lower back; had some tenderness to

palpation over the facets on the right; and had a positive straight leg raise test on

the right with pain traveling no further than immediately below the knee into the

calf. (Tr. 487). She was diagnosed with lumbar spondylosis and low back pain,

but it was noted that Nurse Thompson was unable to determine the etiology of her

pain based on multiple negative diagnostic imagining tests. (Tr. 487). Nurse

Thompson noted that there were no other medication recommendations to make,

and instructed Plaintiff to follow-up with her primary care physician. (Tr. 487).

On September 11, 2012, Plaintiff had an appointment with Dr. Albright for

worsening lower back pain that radiated to her right thigh and was sharp and

stabbing. (Tr. 420). Her pain was aggravated by bending, sneezing, standing, and

twisting. (Tr. 420). It was noted that Plaintiff had been to pain management, but

they had "nothing else to offer," and that an MRI was negative except for ovarian

cysts. (Tr. 420). Her chronic problems were listed as Fibromyalgia and migraines.

(Tr. 420). Plaintiff's exam revealed she was in moderate distress and had

tenderness in her lumbar spine and right thigh. (Tr. 421).

On October 6, 2012, Plaintiff had an appointment with Dr. Albright for the

onset of a cold. (Tr. 413). At this visit, it was noted that Plaintiff's diagnoses

included Fibromyalgia and migraines. (Tr. 415).

On October 11, 2012, Plaintiff had an appointment with Dr. Albright for

lower back pain that radiates into her right thigh described as a deep and sharp pain and aggravated by standing and twisting. (Tr. 417). It was centered over her right sacroiliac area, and Plaintiff denied relieving factors. (Tr. 417). Dr. Albright suggested seeing a pain psychologist as there were no answers to her pain based on MRI and x-ray reports. (Tr. 417). Her chronic problems were listed as Fibromyalgia and migraines. (Tr. 417). Her exam revealed a tender cervical and lumbar spine, but her forward bending was ok. (Tr. 418). She was scheduled for a follow-up visit in four (4) weeks. (Tr. 418).

On November 26, 2012, Plaintiff had an appointment with Everett Hills, M.D. for low back pain and neck pain that radiated from her neck down her arm and back and right side of the back of her legs. (Tr. 481). Plaintiff's chief concern was that her legs were getting numb. (Tr. 481). She rated her current pain level at an eight (8) out of ten (10), with her best pain score being a five (5) out of ten (10). (Tr. 481). Her worst pain level occurred during sitting, standing, walking, bending forward, and driving. (Tr. 481). Her physical exam revealed that she had: a normal lumbar lordosis; equivalent height in her hips; normal tone and muscle definition in her lower extremities; intact cervical flexion, extension, and side bending movements; pain in the upper trapezius upon palpation of the neck to the right of the midline; low back discomfort at palpation along the L3-L4 level;

5/5 strength in the deltoids, biceps, triceps, forearm flexors, grip strength, hip flexors, knee extensors, ankle dorsiflexors, and plantar flexors; intact sensation to pinprick from C5-T1 and L1-S1 bilaterally; a good withdraw response to Babinski testing in her toes; an elicited Hoffmann sign in both thumbs; a negative Spurling test; no clonus with ankle dorsiflexion bilaterally; normal swing and stance phase during ambulation; no ataxic or antalgic gait patter; fluent speech; appropriate speech content; and a pleasant, cooperative affect. (Tr. 482). Dr. Hill's impression was that Plaintiff had low back pain, chronic pain, and cervical neck pain. (Tr. 482). Dr. Hills ordered a cervical MRI, increased Plaintiff's Neurontin dose, and scheduled her for a follow-up in two (2) weeks. (Tr. 482).

On December 8, 2012, Plaintiff underwent an MRI of her cervical spine. (Tr. 476). The impression notes that Plaintiff had mild degenerative changes in the cervical spine without significant canal or foraminal stenosis, and mild prominence of the central canal at C6-C7 with a normal cervical cord. (Tr. 477).

On December 10, 2012, Dr. Albright completed a Residual Functional Capacity Questionnaire. (Tr. 450). Dr. Albright opined that Plaintiff could frequently lift less than ten (10) pounds; had limitations on repetitive reaching, handling, and fingering, and could only use her hands, fingers and arms ten percent (10%) of the time. (Tr. 450-51). He further opined that Plaintiff would

need to take excess breaks; could only walk one (1) block; could sit for ten (10) to

fifteen (15) minutes and stand/walk for ten (10) to fifteen (15) minutes at a time;

could sit for a total of one (1) hour in an eight (8) hour workday; could stand and

walk for a total of one (1) hour in an eight (8) hour workday; required a job that

permitted shifting positions; and would be unable to maintain full time work. (Tr.

450-51). Dr. Albright, however, refused to opine as to whether Plaintiff was a

malingerer. (Tr. 450).

On January 2, 2013, Plaintiff had an appointment at Hershey Medical

Center with Evertt Hills, M.D. for complaints of chronic low back pain, cervical

pain, and Fibromyalgia. (Tr. 468). It was noted that Plaintiff had undergone an

MRI of her cervical spine, which showed that Plaintiff had some mild

degenerative changes in the cervical spine without evidence of spinal stenosis, a

mild prominence at the C6-C7 central canal without signs of signal morphology

and spinal cord involvement. (Tr. 468). Plaintiff described her pain in her lower

back and worsening and constant, and described her right leg pain as feeling as if

"200 pounds sitting on her leg." (Tr. 468). She reported that housekeeping

activities set off her pain, and physical therapy made her condition worse. (Tr.

469). Her medications list at this appointment included Advil, Loestrin, and

Neurontin. (Tr. 469). Her physical exam revealed that she had: a normal lordotic

curvature; tenderness to light touch in the right lower lumbar and upper buttocks area; functional bending movements in her spine at the lumbar and cervical levels; 5/5 strength in the deltoids, biceps, triceps, grips strength, hip flexors, knee extensors, ankle dorsiflexor, and plantar flexors; light touch sensation intact from C4-T1 in both upper extremities and L1-S1 in both lower extremities; and sitting negative straight leg raising tests bilaterally. (Tr. 469). Dr. Hill's impression was that Plaintiff had Lumbago and chronic pain. (Tr. 469). She was prescribed Amitriptyline and diclofenac topical gel for a suspicion of Fibromyalgia, and was scheduled for a return visit in two (2) months. (Tr. 469).

On March 4, 2013, Plaintiff had an appointment at Hershey Medical Center with Everett Hills, M.D. for chronic low back pain. (Tr. 461). It was noted that Plaintiff had been seen by Dr. Hills a month earlier, when she stated that she was applying for social security disability and did not wish to consider physical therapy. (Tr. 461). Plaintiff reported that her pain was localized in the back of her head on the right side of her neck extending down her shoulder and her right side into the lower right extremity. (Tr. 461). Her leg pain increased when driving to a seven (7) out of ten (10). (Tr. 461). Her list of medications at this visit included Advil, Loestrin, Neurontin, Voltaren, and Amitriptyline. (Tr. 461). Her physical exam revealed she: was in no acute distress; had normal lumbar lordotic curvature;

had no restrictive movements with flexion, extension of the neck, or low back; had

5/5 strength in the hip flexors, knee extensors, ankle dorsiflexor and plantar

flexors; had normal reflexes in the patellar and Achilles tendons bilaterally; had

intact sensation at the L1-S1 disc heights bilaterally; exhibited an inconsistent

sharp, dull response without drematomal pattern at the L1-S1 levels; had normal

ambulation for swing and stance with no ataxic or antalgic pattern; had no focal

neurological or musculoskeletal deficits; and was negative for sacroiliac joint

pathology bilaterally. (Tr. 462). She was diagnosed with low back pain, and was

agreeable to the consideration of a functional capacity evaluation. (Tr. 462).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

"At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status

requirements of the Social Security Act through the date last insured of December

31, 2011. (Tr. 22). At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of December 31,

2005. (Tr. 22).

At step two, the ALJ determined that Plaintiff suffered from the severe[7]

combination of impairments of the following: "mild mental retardation, pain

disorder, asthma, degenerative disc disease, fibromyalgia and migraines (20 C.F.R.

404.1520© and 416.920©)." (Tr. 22).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926). (Tr. 23-24).

At step four, the ALJ determined that Plaintiff had the RFC to perform light

---

7. An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,
sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An
impairment or combination of impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

work with limitations.  (Tr. 24-27).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform light work as
> defined in 20 CFR 404.1567(b) and 416.967(b) except that she
> requires a sit stand option at will, occasional climbing of stairs,
> balancing, stooping, kneeling, crouching and crawling, and
> needs to avoid climbing ladders and moderate exposure to
> irritants. [Plaintiff] retains the mental capacity for simple
> routine and repetitive tasks in a work environment free from
> fast-paced production involving only simple work related
> decision with few, if any, work place changes.

(Tr. 24).

At step five of the sequential evaluation process, considering Plaintiff's age,

education, work experience, and RFC, the ALJ determined "there are jobs that

exist in significant numbers in the national economy that the [Plaintiff] can

perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 28).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between December 31, 200 5 the alleged

onset date, and the date of the ALJ's decision.  (Tr. 29).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ's analysis

at Step Three of Plaintiff's mild mental retardation under Listing 12.05( c) is

inadequate because he did not perform a Psychiatric Review Technique in his

decision; (2) the ALJ's RFC determination is unsupported by substantial evidence

because the ALJ erred by giving inadequate weight to the opinion of Dr. Albright;

(3) the ALJ's credibility determination is unsupported by substantial evidence; and

(4) the ALJ's Step Five determination is unsupported by substantial evidence.

(Doc. 14, pp. 5-15). Defendant disputes these contentions. (Doc. 17, pp. 18-35).

### 1. **Step Three Determination**

Plaintiff asserts that the ALJ erred in failing to engage in the Psychiatric

Review Technique in violation of the standard set forth in 20 C.F.R. § 404.1520a,

and that her claims therefore should be remanded. (Doc. 14, pp. 10-11). Upon

review of this regulation and relevant case law, Plaintiff is correct in this assertion.

Regarding Plaintiff's mild mental retardation impairment under Listing

12.05, the ALJ determined the following:

> [Plaintiff's] mental impairment has been considered under the
> requirements of listing 12.05. Mental retardation refers to
> significantly subaverage general intellectual functioning with
> deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22. Although
> [Plaintiff] tested with IQ scores in the 60s, the record fails to
> establish deficits in adaptive functioning consistent with this
> listing section. For instance, [Plaintiff] is a single mother of
> two young children who she alleges are special needs children.
> [Plaintiff] reports being able to care for her children, herself
> and able to manage their SSI payments.

(Tr. 24).  According to 20 C.F.R. § 404.1520a, Evaluation of Mental Impairments, once a medically determinable impairment is found, the ALJ must then assess a claimant's degree of functional limitation in the following four (4) broad categories: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  See 20 C.F.R. § 404.1520a(c)(1-4). One this psychiatric review technique is performed, according to  20 C.F.R. § 404.1520a(e)(4), the ALJ and Appeals Council levels, "the written decision must incorporate the pertinent findings and conclusions based on the technique.  The decision must show . . . the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph © of this section."  See 20 C.F.R. § 404.1520a(e)(4).

In analyzing this regulation, the United States Court of Appeals for the Third Circuit stated, "When there is evidence of a mental impairment that allegedly prevent a claimant from working, the Commissioner must follow the procedure for evaluation mental health impairments set forth in  20 C.F.R. § 404.1520a."  Plummer v. Apfel, 186 F.3d 422, 432 (3d Cir. 1999); see Calcek v. Commissioner of Social Security, 2003 U.S. Dist. LEXIS 13564, at *11-20 (M.D. Pa. July 31, 2003) (holding that remand was warranted because the ALJ was on

notice that the claimant's depression compromised her vocational abilities and therefore had a duty to follow the procedure outlines by 20 C.F.R. § 404.1520a.).

In the case at hand, the ALJ clearly did not follow the procedure set forth in 20 C.F.R. § 404.1520a and the relevant case law upholding this regulation. Nowhere in his decision, let alone at Step Three, did the ALJ present the findings of the Psychiatric Review Technique performed on March 26, 2012 by Dr. Fretz, who opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 59). As such, substantial evidence does not support the ALJ's Step Three determination of Plaintiff's mild mental retardation impairment, and remand is thus warranted. Furthermore, because remand is warranted, this Court declines to address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the

34

Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: July 20, 2016

/s/ **William J. Nealon**
**United States District Judge**